**WO**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Rebecca Cruz,

        Plaintiff,

v.

Arizona Department of Transportation,

        Defendant.

No. CV-23-02383-PHX-ROS

**ORDER**

Plaintiff Rebecca Cruz brought this action under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and the Arizona Civil Rights Act ("ACRA") alleging discrimination on the basis of disability, failure to accommodate, and retaliation by her employer, Defendant Arizona Department of Transportation. Before the Court are Defendant's Motion for Summary Judgment, (Doc. 49), and Plaintiff's Motion for Summary Judgment or for Partial Summary Judgment (Doc. 50). The Motions are fully briefed. For the reasons below, both Motions (Docs. 49; 50) will be denied.

## I.   Background[1]

Plaintiff is a military veteran of the Air National Guard and the Air Force. She was evaluated by the Veterans' Benefits Administration ("VA") for posttraumatic stress disorder and migraines; the VA found Plaintiff had "a total service-connected disability that was permanent in nature" and that her PTSD was 100% disabling and her migraines 50% disabling, resulting in "very frequent completely prostrating and prolonged attacks."

---

[1] Unless otherwise noted, all facts set forth below are undisputed or not subject to reasonable dispute based on proffered admissible evidence.

(Doc. 51-8 at 3).

Plaintiff began working for Defendant on March 1, 2021, as an Executive Consultant in the Financial Management Services division ("FMS"). (Doc. 33 ¶ 19). At that time, all FMS employees, including Plaintiff, worked remotely due to COVID-19 restrictions. (Docs. 33 at ¶ 20; 41 at 9). Plaintiff's supervisor was Kristine Ward, Defendant's Chief Financial Officer. During her first year of employment, Plaintiff's performance review reflected that she met expectations (Doc. 49-1 at 66-73). In March 2022, FMS announced a return to a hybrid work schedule rather than fully remote work. (Doc. 49 at 2-3). The hybrid schedule would require employees to work in-office two scheduled days per week. (*Id.*) Transitioning to in-person work concerned Plaintiff because "spending time in public places and/or driving or being a passenger in a vehicle triggered [Plaintiff's] PTSD symptoms, the aftermath of which could last many hours," and "the onset of PTSD symptoms often triggered [her] migraines which would incapacitate her completely." (Doc. 33 ¶¶ 28-29).

Plaintiff then submitted an accommodation request to Defendant's Civil Rights Office ("CRO") seeking permission to work from home permanently. (Doc. 51-5 at 1). She stated that she would have "huge difficulty performing any tasks" if required to travel to the office to work and that "Even being physically present at work two days a week would significantly trigger [her] disabilities." (*Id.*) Plaintiff had her initial interactive meeting with CRO on March 16, 2022. (Doc 49-2 at 7).

Plaintiff, among other FMS employees, worked four ten-hour days each week with the fifth day as a "flex" day. (Doc. 56 at 12). Plaintiff learned that some FMS employees had their "flex" days on one of their assigned in-office days and thus did not have to come to the office on those days; as a result, they only had one in-office day rather than two. Plaintiff spoke to Tim Newton, the Deputy Chief Financial Officer, and asked if she could move her "flex" day to coincide with one of her assigned "in-office days" to similarly reduce the times she was required to come in to the office. (Doc. 33 ¶ 30). But Newton informed her she would need to formally go through the CRO to seek an accommodation

if she wanted to use her flex day as such. (Docs. 33 ¶¶ 30-33; 56 at 12-13).

CRO staff met with Ward and Newton to discuss Plaintiff's job functions and possible accommodations. Newton stated that "there weren't any physical aspects to the position, other than the occasional box needing to be moved, walking to meet with people, and physically attending meetings" and "in a 'clinical' sense, there aren't any tasks that can't be performed remotely," but that "the quality of the work needed[] can't be done without the deeper relationships being built." (Doc. 49-2 at 23-34). Ward stated "we hired the job with the premise of coming into the office, this position has always been and [*sic*] in-office position" and indicated in-office attendance was important because the position is "a leadership role and they need to model good practices," and she was "concerned about setting precedents" because "she is aiming to have people be back in the office." (*Id.* at 25).

When asked about accommodation possibilities, Ward and Newton indicated that "if Plaintiff nee[ed] to step away, she [would] be allowed to do so" and there were "nursing rooms with rocking chairs available," or Plaintiff could "utilize Tim Newton's office, as needed" and "Mr. Newton can grab his laptop and leave for an hour." (Doc. 49-2 at 25). Ward suggested that "[Plaintiff] can arrive in advance of the day as needed" to "allow her time to decompress from the drive," and "perhaps [Plaintiff] would find a pre-work meditation practice helpful." (*Id.*)

The CRO received documentation from Plaintiff's medical providers in the form of medical status reports ("MSRs") and supplemental questionnaires. Each provider recommended permanent remote work and marked Plaintiff's disability as permanent. (*See* Docs. 51-8; 51-9). One provider stated Plaintiff "cannot drive or operate an automobile or be transported in a vehicle at this time unless under emergency situations" and noted that treatment would work "towards [Plaintiff] eventually being able to travel again in vehicles by driving and being driven. This may take a significant time to achieve." (Doc. 51-8 at 6-7). He further indicated a prognosis of six months to see improvement. (Doc. 51-9 at 2-4). Another provider noted "this is a permanent lifelong process with severe exacerbations."

(Doc. 51-8 at 12). In response to communication from Defendant that "the option to work remote, full time, indefinitely is not an option," one provider wrote "I am unable to safely recommend any other alternative work accommodation at this time." (Doc. 51-9 at 36).

On May 16, 2022, CRO officers informed Plaintiff they intended to deny her permanent remote work accommodation but would offer other accommodations, such as the use of nursing rooms for breaks. (Doc. 51 ¶ 23). Plaintiff alleges the CRO officers "advised that they were preparing a determination memo and would check back in a month or two to make sure everything was fine" (Doc. 51 ¶ 24), and Defendant states, "[Plaintiff] rejected the accommodations proposed by the CRO" and "the interactive process was set to continue and no determination memo was prepared." (Doc. 57 at 4). On August 2, 2022, after receiving further supplemental medical reports, the CRO sent Plaintiff a written determination memo. It denied her request for permanent full-time remote work but granted temporary remote work until February 13, 2023, at which time Plaintiff would be expected to return to the office.

Plaintiff learned of two open positions in another department under the management of Lisa Pounds. (Doc. 49 at 7). Plaintiff met with Pounds, and Pounds subsequently emailed Wendy Brazier in the Human Resources department inquiring about the "possibility/logistics" of a transfer. (Docs. 49 at 7; 51-26 at 1). Brazier notified Pounds that Plaintiff had an ADA accommodation and a meeting was set to discuss it. (Doc. 51-26 at 1-2). Plaintiff heard nothing else until she received an email announcing the positions had been filled. Subsequently Pounds offered Cruz a different position, two grades lower and making $40,000 less than Plaintiff's current position. (Doc. 56 at 5).

Before Plaintiff's temporary remote work accommodation ended in February 2023, she requested and was granted an extension until March 13, 2023. (Docs. 33 ¶ 92; 49 at 6). Plaintiff believed the temporary grants of remote work, each with an expectation of a return to office work, were inappropriate, and they caused her significant stress and anxiety. (Doc 51 at ¶ 32, 34-35). On March 6, 2023, she submitted a second accommodation request again requesting a permanent remote work accommodation. (Doc. 51-13 at 1). On March

16, 2023, Defendant approved Plaintiff to work remotely until a final decision was made. (Doc. 51-13 ¶ 36).

On October 6, 2023, Defendant issued a determination letter purportedly granting Plaintiff a full-time remote work accommodation. The memo stated: "the telework accommodation has been provided on a temporary basis[,] but this memorandum will confirm that you have been approved [for] full-time telework on an ongoing basis." (Doc. 51-17 at 1). Plaintiff subsequently brought this action in November 2023. Plaintiff and Defendant each move for summary judgment on all claims.

## II.    Legal Standard

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record that it believes demonstrates the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The non-moving party must then point to specific facts establishing there is a genuine issue of material fact for trial.  Id.

At summary judgment, the Court considers only admissible evidence.  See Fed. R. Civ. P. 56(c)(1)(B).  When considering a motion for summary judgment, a court should not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). A genuine issue of material fact exists "if the [admissible] evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248. In ruling on the motion for summary judgment, the Court will construe the evidence in the light most favorable to the non-moving party. *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991).

To establish a claim for discrimination on the basis of disability, Plaintiff must show "(1) that she is disabled within the meaning of the ADA; (2) that she is a qualified

individual with a disability; and (3) that she was discriminated against because of her disability." *Smith v. Clark County School Dist.*, 727 F.3d 950, 955 (9th Cir. 2013); *see also Walton v. U.S. Marshals Service*, 492 F.3d 998, 1005 (9th Cir. 2007) (The ADA's "standards of substantive liability are incorporated in the Rehabilitation Act."). "Notably, the ADA standards for disability discrimination claims apply to similar claims brought under the Arizona Civil Rights Act ("ACRA"), A.R.S. § 41–1463, as the ACRA is modeled after federal employment discrimination laws." *Whitmire v. Wal-Mart Stores Incorporated*, 359 F.Supp.3d 761, 792 (D. Ariz. 2019) (citation modified).

### III. Discussion

#### a. Disparate Treatment

"To show a *prima facie* case of disparate treatment under the ADA, [Plaintiff] must show that, within the meaning of the statute, [s]he: (1) is disabled; (2) is qualified; and (3) suffered an adverse employment action because of [her] disability" that "materially affected a term of [her] employment." *Jefferson v. Time Warner Cable Enters. LLC*, 584 F. App'x 520, 522 (9th Cir. 2014). There is no dispute that Plaintiff is disabled or that Plaintiff is a qualified individual. (Docs. 33 ¶¶ 115-116; 34 ¶¶ 115-116). Thus, the only element at issue is whether Plaintiff has suffered an adverse employment action as a result of her disability.

Plaintiff asserts she suffered adverse employment actions through the denial of the ability to use her "flex" day to cover one of her in-office workdays, denial of a lateral transfer opportunity followed by an offer to transfer to an inferior position, inappropriate implementation of the interactive process, and negative behaviors toward Plaintiff by Ms. Ward. Defendant contends Plaintiff's claim fails as a matter of law because she cannot establish any of these actions constitutes an adverse employment action. The Court finds questions of material fact remain such that summary judgment is inappropriate on this claim.

First, Plaintiff has presented specific admissible evidence that she was not allowed to use her "flex" day similarly to other employees to replace one of her assigned 'in-office'

days. Plaintiff, and most other FMS employees, worked four ten-hour days with one "flex" day. (Doc. 51 ¶ 57). Under the anticipated hybrid schedule, each employee would have two assigned 'in-office' days and two remote days. Four other employees were allowed to have their "flex" day coincide with one of their assigned in-person shifts, thereby avoiding having to go to the office on that day. (Doc. 56 at 12-13). When Plaintiff requested permission to do the same, she was rejected. Plaintiff also alleges she was told that if she pushed the issue, Ward would take the privilege away from the other employees, too. (Doc. 51-1 ¶¶ 59-61). Defendant argues that those employees' "flex" day was already established, and they were simply allowed to "keep" the same "flex" day when the hybrid schedule was implemented; Plaintiff, Defendant argues, was simply not allowed to *change* her "flex" day to align with her in-person shift. (Doc. 56 at 12-13). Neither party has detailed the facts establishing the parameters of what a "flex" day entails or how it may generally be used, but the use of a "flex" day appears to materially impact the conditions of Plaintiff's work— where she works and when—and, likewise, the denial of the ability to use her flex day in a similar manner to other, non-disabled employees. Thus the evidence on summary judgment is sufficient to find the Defendant's actions may constitute an adverse employment action.

Plaintiff further alleges she was denied a potential lateral transfer opportunity to Lisa Pounds' department as a result of her disability and accommodation request. Defendant argues Plaintiff cannot claim to have had a transfer denied because she never formally applied for the position. However, Ms. Pounds' agreement to meet and discuss the transfer and communication to HR, (Doc. 51-26 at 1), and the subsequent offer of another position, (Docs. 33 ¶ 81; 51-1 ¶ 70), suggest reaching out to the department manager internally may have been a legitimate method of seeking a transfer. Thus a formal application was not always a prerequisite. Moreover, when Plaintiff expressed her desire to transfer to an open position, Ms. Pounds indicated they could discuss the matter when she returned to work in two weeks. (Doc. 51-25 at 1-2). According to facts considered on summary judgment, not only was Plaintiff not told she would need to apply formally before she could be considered for interview, but there was no indication that Plaintiff would lose

the opportunity to potentially transfer by waiting for the promised meeting. Plaintiff's evidence, while not conclusive as a matter of law, is sufficient to create a question of fact of whether Defendant's explanation that Plaintiff could not have been granted the transfer because she never applied was pretextual. Because material questions of fact remain, summary judgment will be denied on this claim.

### b. Failure to Accommodate

The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a "qualified individual," the employer receives adequate notice, and a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business. *Snapp v. United Transportation Union,* 889 F.3d 1088, 1095 (9th Cir. 2018). A claim for failure to accommodate "results from denying an available and reasonable accommodation." *Id.* Thus, to survive summary judgment, Plaintiff must show Defendant "failed to provide a requested reasonable accommodation, failed to engage in an interactive process where a reasonable accommodation would have been possible, or terminated [Plaintiff] because of her disability." *Cooper v. Dignity Health*, 438 F. Supp. 3d 1002, 1008 (D. Ariz. 2020).

Plaintiff asserts Defendant has failed to engage in the interactive process in good faith and has refused to provide her with a reasonable accommodation. Defendant contends this claim fails as a matter of law because Plaintiff "requested an accommodation to work remotely fulltime and the State has continually allowed [her] to work remotely fulltime." (Doc. 19 at 9).

Defendant is correct that there can be no failure to accommodate claim where a reasonable accommodation has been provided. But whether the accommodation offered was and is reasonable remains a disputed question in this matter. Indeed, there is admissible evidence in the record to allow reasonable minds to conclude that Defendant did not "[go] above and beyond to accommodate and support [Plaintiff]" or "[seek] to accommodate [her] at every opportunity," but rather strongly avoided accommodating her.[2]

---

[2] For example, the CRO memo detailing the interactive process following Plaintiff's initial request shows that when discussing possible accommodations, CFO Kristine Ward made

Although Defendant asserts it has granted Plaintiff the very accommodation she requested, Plaintiff has shown the permission she has received to work remotely has always been framed as "on a temporary basis" and thus can be revoked at any time based solely upon Defendant's discretion. The memorandum of decision granting Plaintiff's current accommodation grants full-time remote work, but inconsistently states "the telework accommodation has been provided on a temporary basis[,] but this memorandum will confirm that you have been approved [for] full-time telework on an ongoing basis." (Doc. 51-17 at 1). Plaintiff has presented undisputed substantial medical documentation characterizing her impairment as permanent and has alleged the process of seeking and receiving piecemeal extensions of permission to work remotely has been stressful and burdensome. There remain material questions of fact whether the most recent accommodation is substantially different from the permanent remote work Plaintiff requested and whether it is a reasonable accommodation of Plaintiff's disability.

### c. Retaliation

"To succeed in a retaliation claim, the plaintiff must demonstrate (1) that she was engaging in protected activity, (2) that she suffered an adverse employment decision, and (3) that there was a causal link between her activity and the employment decision." *Hashimoto v. Dalton*, 118 F.3d 671, 679 (9th Cir. 1997). The causal link "may be inferred from proximity in time between the protected action and the allegedly retaliatory employment decision" if the Plaintiff "make[s] some showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity." *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003), *opinion amended on denial of reh'g*, 2003 WL 21027351 (9th Cir. 2003). "In the retaliation context, an adverse employment action is an action that is reasonably likely to deter employees from engaging in protected activity." *Wood v. Univ. Physicians Healthcare*, 2014 WL 3721207, at *11 (D. Ariz. 2014), *aff'd*, 657 F. App'x 643 (9th Cir.

suggestions such as "pre-work meditation practice" and "arrive in advance of the day…to decompress," refused to consider remote work despite being unable to articulate specific functions that required in-person work, and was generally resistant to any type of substantial accommodation. (*See* Doc. 49-2 at 20-29.)

- 9 -

2016).

Defendant appears to argue, without authority, that no action can be considered an adverse employment action where a Plaintiff continues to engage in protected activity. Defendant claims to be entitled to summary judgment on Plaintiff's retaliation claim because "it is unclear what would or could deter Cruz from engaging in protected activity" and "nothing that [Defendant] has done deterred it . . . . Practically speaking, the Court should determine that Cruz has not been deterred and therefore has not experienced actions that would deter her from pursuing protected activity against her employer." (Doc. 49 at 13-14). This peculiar argument would essentially render recovery for retaliation claims impossible, as anyone seeking relief has clearly not been deterred from doing so. The standard does not require actual deterrence. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (stating "in our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" and "we refer to reactions of a reasonable employee because we believe that the provision's standard for judging harm must be objective. An objective standard is judicially administrable.")

Plaintiff argues the denial of her request to use her "flex" day to cover one of her in-office days was a retaliatory action. Although the parties do not provide the exact details of a "flex" day, the denial of the ability to use it in a way similar to other employees may be reasonably likely to deter an employee from taking protected action. Whether this was the case is a disputed question of material fact.

A denial of a lateral transfer may be reasonably likely to deter an employee from taking protected actions. In this case, Plaintiff reached out to Pounds, who agreed to meet and discuss the possibility of transfer. Pounds met with Plaintiff and emailed Wendy Brazier regarding the "possibility/logistics" of such a transfer. (Docs. 49 at 7; 51-26 at 1). After Brazier notified Pounds of Plaintiff's ADA accommodation, (Doc. 51-26 at 1), Plaintiff received no further communication until she received an email announcing the

positions had been filled. Subsequently, Pounds offered Cruz a different and substantially inferior position. (Doc. 56 at 5). The timeline of events allows a reasonable inference that Plaintiff's accommodation was the reason Plaintiff was never given the chance to interview for the desired position and was offered a lower paying position.

In addition to the alleged adverse actions as discussed, Plaintiff describes a change in Ms. Ward's behavior towards her after requesting an accommodation. She alleges Ward became hostile, made negative comments about Plaintiff publicly, cancelled one-on-one meetings, and uninvited Plaintiff from meetings regarding work that was assigned to Plaintiff. The nature and consequences of these meetings and statements are not fully expounded by the parties, thereby creating a question of fact whether these actions are reasonably likely to deter an employee from requesting an accommodation. *See Burlington N.*, 548 U.S. at 69 ("A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.")

Accordingly,

**IT IS ORDERED** Defendant's Motion for Summary Judgment (Doc. 49) is **DENIED**.

**IT IS FURTHER ORDERED** Plaintiff's Motion for Summary Judgment or in the alternative, Motion for Partial Summary Judgment (Doc. 50) is **DENIED**.

Dated this 16th day of March, 2026.

Honorable Roslyn O. Silver
Senior United States District Judge